Estate of Ida A. Crawley, Deceased, George C. Brosius, as Executor v. Commissioner.
Estate of Ida A. Crawley v. Commissioner
Docket No. 19289.
United States Tax Court
1950 Tax Ct. Memo LEXIS 232; 9 T.C.M. (CCH) 286; T.C.M. (RIA) 50081; March 30, 1950
*232 Harry G. Taylor, Esq., Miami, Fla., for the petitioner. F. L. Van Haaften, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined a gift tax deficiency of $21,544.88 for the calendar year 1941, and a delinquency penalty of $5,386.22 for failure to file gift tax return. Petitioner asserts no gift taxes are due, since the alleged transfers upon which the Commissioner bases same did not constitute gifts, because: (a) of the mental incapacity of the transferor to execute same; (b) that the transferor "did not divest herself of all of her economic interest in and dominion and control over the subject matter of said alleged gifts, all of the parties knowing and fully understanding that the purported transfers were without force or effect." In the alternative petitioner says that the values of the alleged gifts, as determined by the Commissioner, are excessive. Findings of Fact Ida A. Crawley (hereinafter called decedent), a resident of Miami, Florida, (formerly of Evanston, Illinois) died testate March 30, 1943, when 55 days past eighty years of age. Her husband, Murray D. Crawley, died in 1921 and *233 she never remarried. Her only heirs, being also children of her deceased husband, were four daughters, who also were named as the sole and equal beneficiaries in her will. They were Helen Crawley, unmarried, (nicknamed Nell), Mrs. Mary C. Brosius, Mrs. Dorothy Kipp (formerly McCarthy) and Mrs. Margaret Perricelli (formerly Reed). George C. Brosius, son-in-law of decedent, is the executor of her estate. Decedent's husband was a successful business man and left his entire estate to her, which consisted largely of dividend-paying stocks in Canadian and American corporations which he and his associates had established and which stocks are here involved. Decedent was not a business woman, knew nothing about business and took no interest therein, and upon her husband's death she left the management and control of her business largely in the hands of her brother until his death in 1935, and also to F. C. McCracken, who had been her husband's partner in Canada in Murray-McCracken Co., Ltd. Mr. McCracken died about 1940. Thereafter her nephew, Neil Williams, and her cousin, Hargrave Long, both attorneys of Chicago, at times assumed to act as legal and business advisor to her and her daughters. *234 In 1940 decedent, then in her seventyeighth year, was weak physically and mentally. In addition to senility she had a serious diabetic condition of long standing, requiring the taking of insulin, hardening of the arteries or arteriosclerosis, also angina pectoris. From 1938 to August 1942 she was under he care of Dr. Arthur R. Colwell, a practicing physician of Evanston, Illinois, where she then resided. In May 1940 Dr. Colwell was compelled to place her in a hospital because of her "extreme nervousness, insomnia, irritability, forgetfulness and mild confusion." Again in February 1941, Dr. Colwell had her hospitalized for the same reason. During these periods of hospitalization her symptoms somewhat improved, but her physical and mental condition remained bad, her ailments being permanent, there was a progressive deterioration of her mental faculties and "She was not of sound mind and understanding at any time" subsequent to 1939. On March 26, 1941, decedent made her will, leaving her property equally to her four daughters. On July 18, 1941, she fell and broke her hip and was immediately hospitalized and was put in a cast, the hip was pinned surgically and she remained in the *235 hospital until September 13, 1941. During this period Dr. Colwell, her physician, saw her daily and he was assisted in her treatment by a surgeon. As a result of this fall, both her physical and mental impairment were greatly augmented and thereafter her mentality was such that she was incapable of understanding either the details or the nature and effect of any business transaction, and in the language of her family physician, "she was mentally incompetent to transact business at all times during the last half of the year 1941." Due to her mental impairment she did not understand the extent and value of her property. Instances illustrative of this: (1) she gave a magazine solicitor calling upon her over $100 worth of subscriptions, and among them were three or four magazines to which she was already a subscriber; (2) she would pay bills two or three times; (3) buy extravagantly things unnecessary and not needed; (4) constantly lost her bank book; (5) would sell bonds and borrow money when not needed; (6) she was obsessed with the idea that she had inexhaustible funds. Other incidents: often she did not know relatives and friends of long standing; she developed suspicion and thought *236 her nurse was trying to rob her; while living in Evanston she thought she was at her daughter's in a different state. Her family, not wanting to have her adjudged mentally incompetent and a guardian appointed, in lieu of this, after conference with Niel Williams and preparation of legal documents by him, caused her, on August 18, 1941, to execute a general power of attorney to her son-in-law, George C. Brosius. The power of attorney and the outline of procedure were two separate instruments, counterparts of each other, and were contemporaneously executed. The former, in addition to the general powers usually contained therein, enumerated many comprehensive and specific powers. The effect of the two instruments was to place immediately in Brosius' custody all of decedent's property and to give him the exclusive management and absolute control of same. He could buy, sell, mortgage or hypothecate the property, make loans or borrow money or exchange such property upon such terms and conditions as he "in his sole judgment" might determine, employ and discharge attorneys, prepare or cause to be prepared and delivered all returns of taxation required by the Government of the United States *237 or the Dominion of Canada, also to accept or procure his election as a director of any or all foreign or domestic corporations in which decedent may own stock. The last paragraph provided that if any power or authority granted should be held illegal in any jurisdiction "such illegality shall not void or vitiate the exercise of such power in jurisdictions where they are legal," etc. The outline of procedure, among other provisions, directed that Brosius should at once take over all of decedent's property, bank accounts, safety deposit box, contents, etc., and prepare a complete inventory of all property and furnish a copy of same to decedent and a copy to each of her four daughters; that he should render bi-monthly statements to decedent and her four daughters of all receipts and expenditures, prepare a tentative budget for the living expenses of decedent and her daughter who lived with her, to be within the expected income with some reserve for decreased income and increased taxes. All store accounts were to be cancelled and future family expenses of decedent should be upon a cash basis. This document contained a recital that its contents might have been included in the power of *238 attorney, but were omitted because the power of attorney would have to be exhibited to outsiders. Brosius accepted under the power of attorney, took possession of decedent's property and administered same under the authority therein conferred upon him, until decedent's death. After executing the power of attorney, decedent did not at any time thereafter engage in or consider business of any kind. As early as October 1940, Neil Williams and the family became concerned about the conservation of decedent's property and also about taxes that would accrue upon her death. There was then no treaty between the United States and Canada, allowing reciprocal credit for estate taxes paid, hence such taxes would be due in both countries. Under Canadian law all assets owned at the time of death would be enlarged by the total of all gifts within five prior years. Considering decedent's age and health, Williams determined that an immediate disposition of all her Canadian stock was desirable, but an outright sale was not feasible since, under Canadian war regulations, Canada would not permit the transfer in block of the proceeds of a sale to this country, but only in installments over a period *239 of years. To avoid the payment of death dues in Canada and also to minimize estate taxes in the United States, Williams decided that decedent should place the title of both her American and Canadian stocks in the names of her four daughters. Various methods of doing this were considered by Williams and Hargrave Long for nearly a year before its execution. During this period Williams wrote a number of lengthy letters about the subject, the merits and objections to different plans. Only one of these, dated February 14, 1941, containing 6 typewritten pages, was addressed to decedent, and near its close was this sentence: "I know this is a complicated matter and one which deserves your careful consideration." All of his letters thereafter upon this subject were addressed either to Brosius or to the daughters, mainly to Brosius with carbon copies to each daughter, but no carbon to decedent. The plan finally adopted, evolved by Williams, was described in a letter from him to Brosius dated September 17, 1941, (carbon copy to each daughter, but not to decedent) from which we quote: "Further research I have been conducting in the last few days * * * has * * * led me to change the theory *240 on which we should proceed. * * * to treat the transaction whereby Aunt Ida divests herself of her entire estate giving a quarter of it to each of her four daughters on the basis of a purchase and sale rather than on the theory of a gift. * * * [Italics supplied]" The letter then sets out the plan in detail. In substance, and as adopted, decedent transferred to each of her four daughters one-fourth of all stocks owned by her, and for which each daughter agreed to pay her $100 per month so long as decedent lived. The daughters, immediately upon receipt of the stock, delivered custody and control of same to Brosius, decedent's attorney in fact, and all dividends therefrom were expended for decedent's use and benefit, and if the income therefrom proved insufficient for her support, then the stock, or a part of it, could be sold and the proceeds used for that purpose. The daughters' sale or disposition of the stock was restricted and it was to be held as one block by Brosius for decedent. The hundred dollar monthly payments provision was a mere formal recital of consideration; none of same was ever paid, and the daughters were not expected to pay it. All parties understood the sole *241 purpose of the transaction was to minimize estate taxes upon decedent's death, and after the papers were executed putting into effect "the theory of purchase and sale," Brosius and also the daughters still regarded the stock allegedly transferred to them as belonging to their mother. While the paper title was vested in the daughters, the actual ownership, management and control of the stock, according to the understanding and agreement of the parties, remained in decedent, to be handled by Brosius as her attorney in fact. It was orally stipulated that written instruments were executed by the parties whose names were signed thereto, as follows: (1) On October 20, 1941, four separate agreements of purchase and sale, each signed by decedent and one of her four daughters, wherein decedent agreed to sell and the daughter therein named agreed to buy a certain designated number of shares of (a) common stock of Murray-McCracken Co., Ltd., of Canada; (b) cumulative preference stock of Murray-McCracken Co., Ltd., of Canada; (c) capital stock of Murray-Galesburg Building Corporation, an Illinois corporation, and (d) stock of Crawley-McCracken Hotel Company, an Illinois corporation, for which *242 the buyer promised to pay as purchase price $100 per month so long as the seller lived. Signing as witnesses were Neil Williams and Margaret E. Pitmon. (2) On October 20, 1941, a single instrument signed by decedent's four daughters, viz: Helen Crawley and Margaret C. Reed, both of New York City, Mary C. Brosius of Miami Beach, Florida, and Dorothy C. McCarthy of Evanston, Illinois. The preamble recited that each of the parties is the owner of blocks of stock, substantially equal in number of shares and in value, in Murray-McCracken Co., Ltd., Murray-Galesburg Building Corporation and Crawley-McCracken Hotel Company, and recited that the parties desire to "deal with said stocks in the future in concert with one another and in the same manner and as though said several blocks were one larger block." Contained among the specific agreements were: no party to sell, pledge, exchange or alienate any shares of the stock without the written consent of a majority of said four parties. All of the stock to be at once deposited with Brosius and retained by him, and he was irrevocably constituted and appointed proxy for all of the parties, with full power and authority to vote any or all of said *243 stock "as he in his sole discretion shall determine." Agreement to be binding and in full force and effect for 15 years from date thereof, unless cancelled or modified by unanimous consent of the parties. Neil Williams and Margaret E. Pitmon, witnesses to instrument 1 above, did not testify and there is no evidence as to the circumstances under which decedent signed same. Aside from the stipulation that she signed it, there is no evidence that she read it or was aware of its contents. The only evidence indicating possible knowledge on her part is: (1) a letter dated September 11, from Hargrave Long to Brosius, advising that on that day he had a telephone talk with Williams, in which Williams told him that he had visited decedent that day at the hospital and explained the plan for "gift of the stocks," which she understood and concurred in. However, subsequent to this date the plan was changed from a gift to the "purchase and sale theory." The plan as executed was never shown to have been read or explained to decedent; (2) Helen Crawley, on cross examination, testified that she thought Brosius and Williams "must have explained the plan to her mother before it was executed," but neither *244 of them testified that they did so, and Helen being in New York, it is apparent that her statement was an assumption rather than a fact. If the transaction had been explained to decedent, her mental condition at that time was such that she would not have understood the consequences and effects thereof. Subsequent to the transfers, dividends on the stocks were paid to the daughters which they immediately gave to Brosius for decedent's use. In their income tax returns for 1941 and 1942 each daughter reported the dividends received by her on the stocks, but they were reimbursed by Brosius therefor out of decedent's funds. On June 30, 1943, Brosius filed petition for probate of decedent's will, dated March 26, 1941, and on July 14, 1943, an order of probate was entered and letters testamentary were issued to Brosius as executor. On June 15, 1944, Brosius, as executor, filed an income tax return for decedent for the taxable year 1941. This return reported no gains from the sale or exchange of any capital assets, reporting only income from dividends, interest and annuities. On June 21, 1944, Brosius, as executor of decedent's estate, filed an estate tax return with the collector *245 of internal revenue for the district of Florida, in which all of the stocks here involved were reported therein as having been sold by decedent on October 20, 1941, to her four daughters, each of whom "paid $100 per month to the decedent in conformity with the contracts of purchase and sale. These payments amounted to the sum of $6,800.00." Subsequently, petitioner, in 1948-1949, did pay estate taxes to the United States Government in an amount of approximately $40,000. This tax included estate taxes upon the value of the stocks here in controversy. On October 16, 1945, Brosius, as executor, filed with the Estate Tax Division of the office of the Commissioner of Internal Revenue a certificate showing that the estate had paid Dominion succession dues (Canada), including interest and penalties, amounting to $27,201.01. On January 24, 1944, in the probate court claims were filed against the estate by Helen Crawley for $143.48, by Dorothy Kipp for $551.06, by Mary Brosius for $476.06, and by Neil Williams and George Brosius, as trustees, for $241.06 "for excess payments on account of the purchase of stock" under an agreement with reference to the purchase of stock. No gift tax *246 return was filed by decedent, but if required so to do, such failure was not due to willful neglect. Decedent and Brosius, her attorney in fact, relying upon advice of attorneys, did not believe the transactions to be taxable gifts. In 1941, due to regulations and war restrictions of the Canadian Government, the market value of Canadian stocks and securities in the United States was 20 to 30 per cent lower than their value in Canada. As of the date of transfers the fair market value in the United States of the corporate stocks here involved was as follows: 3,357 shares Murray-McCracken Co.,
Ltd., Com.
$138,855.60
14,543 shares Murray-McCracken Co.,
Ltd., Pfd.
65,443.50
62 shares Murray-Galesburg Bldg.
Corp.
6,200.00
409 shares Crawley-McCracken
Hotel Co.
10,225.00
Total
$220,724.10
The above valuation is subject to reduction to "present value after life of Ida A. Crawley, born Feb. 5, 1863, Factor.81159," [1] which computation is not here included. Respondent's notice of deficiency determined taxable gifts from decedent to her four daughters to the extent of $237,147.06, with the following *247 explanation: "Donor in October 1941 under the form of a purchase and sale agreement transferred to her four daughters in equal portions the above securities, the daughters to pay her $100 a month each, during her life time. The facts indicate that the effect of the transaction when coupled with an agreement entered into by the daughters was a transfer with income retained to the donor. The present value of the gift is included." The value of the stocks at the time of transfers as determined by the Commissioner was as follows: 3,357 shares Murray-McCracken Co.,
Ltd., Com.
$198,365.13
14,543 shares Murray-McCracken Co.,
Ltd., Pfd.
66,097.94
62 shares Murray-Galesburg Bldg.
Corp.
12,400.00
409 shares Crawley-McCracken
Hotel Co.
15,337.50
$292,200.57
Reduced to present value after life
of Ida A. Crawley born Feb. 5,
1863, Factor
.81159
Present value
$237,147.06
Opinion The issue here is whether the decedent, Mrs. Ida A. Crawley, during her lifetime, made gifts to her four daughters by transfers to them of certain corporate stocks which required the filing of a Federal gift tax return and the payment of a gift tax thereon. The basis of the transactions *248 in question are the four so-called purchase and sales agreements between decedent and her daughters, dated October 20, 1941, wherein she purports to sell to each of them certain securities therein listed, for which each daughter agrees to pay her as the purchase price $100 each month so long as decedent lives. Petitioner does not controvert respondent's determination that the purported transactions were not sales, but insists that respondent erred in determining them to be gifts, and contends they were not gifts, because (1) at the time of their execution decedent was of unsound mind and not mentally competent to execute same; and (2) that regardless of the question of mental competency the transactions did not constitute gifts (a) there being no intention to make a gift, and (b) decedent "did not divest herself of all economic interest in and dominion and control over the stocks," the subject matter of the alleged gifts. It is elementary that a donor must have mental capacity to make a gift, otherwise the transaction is void. Mere mental weakness, however, is not sufficient to invalidate a gift - the mental infirmity must be such that the donor does not have sufficient mental *249 capacity to comprehend the transaction in question nor sufficient intellect to understand the nature and effect thereof. The test in determining mental capacity as accepted and generally applied by the courts is as follows: "* * * The general rule is that, if the donor has sufficient mental capacity to comprehend the transaction, if he understands the extent and value of his property, what persons are the objects of his bounty, and the manner in which he is distributing his property among them, his gift will be valid. * * * 38 C.J.S. 789 § 13 and authorities there cited." Measured by this test, we have concluded from the evidence and the record as a whole that the decedent did not have the required mental capacity at the time to execute the transfers in question. In October, 1941, when the instruments were executed, unquestionably the decedent was of unsound mind. Her mind had been impaired for several years, but after her fall in July, 1941, her mental condition had grown much worse, and according to undisputed medical evidence she was mentally incompetent at all times during the last half of the year 1941, and we have found her wholly unable to transact business of any kind, *250 and that she did not "understand the extent and value of her property." Her family, realizing this, instead of having her legally declared incompetent and a guardian appointed, in August, 1941, had caused her to execute a general power of attorney to her son-in-law, and deliver to him possession, control and management of all her property, including the stocks in question, which he continued to hold and exclusively manage and control throughout the remainder of her life. It does not appear reasonable that one mentally incapacitated to manage her daily or ordinary business affairs or whose mind was so impaired that she did not understand the extent and value of her property and hence could not be entrusted with it would have the mental capacity to comprehend the transactions here in question and to understand the manner in which she was distributing her property or the nature and effect thereof. The method employed in effecting a change of title to the stocks was not a simple one. It was neither an outright gift nor an outright sale. If it had been either, its meaning and effect would have been easier of comprehension to all, and more especially to one having an infirm and debilitated *251 mind. The plan of transfer employed was involved and complicated. It was the culmination of various schemes considered by decedent's two lawyer nephews for nearly a year, they having first considered a gift and then a sale, and finally evolving a plan which combined elements of both. Indicative of its involved and complicated nature is the fact that opposing counsel here differ widely as to the nature and effect of the transfers. Corroborative of decedent's lack of comprehension or ability to comprehend the transaction is the fact that she was ignored in the consideration and determination of the plan. Of the fifty letters in evidence, largely correspondence between the lawyers and members of decedent's family, concerning the proposed transfers, only one upon this subject was addressed to decedent. It was from Williams, written eight months prior to the transfers, and contained this sentence: "I know this is a complicated matter and one which deserves your careful consideration." It is obvious that the complicated nature of the transaction, coupled with the decedent's mental infirmity, was the reason that all subsequent correspondence was had between the lawyers and members of decedent's *252 family rather than with her. It does not appear that the plan as finally executed was ever explained to decedent, but even if it had been, considering her state of mind, we do not think she would have had sufficient mentality to have comprehended it. Respondent asks why, since decedent made a will seven months prior to the transfers, and also executed a power of attorney some six weeks prior thereto, both of which were accepted as valid, the transfers in question were not also valid. Failure to contest these documents is neither proof of their validity nor that of the transfers. We seriously question whether either of these documents would have been sustained if legally attacked on the ground of mental incompetency. The will, however, was executed prior to decedent's fall, when her mind was not so greatly impaired, and its terms were not complicated, it being an outright bequest of all of decedent's property equally to her four daughters. The attorneys who prepared the papers in connection with the power of attorney evidently anticipated that its validity might be attacked, and stipulated that if it should be held illegal in one jurisdiction, it would not vitiate the exercise of *253 powers under it in another. However, regardless of whether the will or the power of attorney, if attacked, would have been sustained, as to the transfers in question we have no doubt that if contested in a court of competent jurisdiction, under the evidence here produced, the court, solely on the ground of mental incompetency, would have held them invalid. Respondent cites and . The essential facts in both of those cases are materially different from those in the instant case. Challiner v. Smith was a contested will case involving both mental incapacity and undue influence. The appellate court reversed a jury verdict for contestant on both issues because of insufficient evidence on undue influence and an improper charge and unsatisfactory evidence on mental incapacity. There, those who witnessed the execution of the will and others testified unequivocally that testatrix in their opinion was then possessed of a sound mind and memory and recited instances in connection with its signing, including statements by her, and other business transactions, such as giving of checks, settlement *254 of farm rents, discussion of income tax, etc., which corroborated the conclusion that she was mentally competent to transact business. Among such witnesses were her family physician, her lawyer, her preacher and others. The testimony of those to the contrary was analyzed by the court and found to be unsatisfactory. In , the court refused to set aside a transfer of corporate stocks on the ground of mental incompetency, since it appeared that during the time in question and subsequent to the execution of a general power of attorney, transferrer carried on and consummated many other transactions, such as employing a contractor to make repairs on her home, purchased household necessities, "sold securities, attended meetings of the board of directors of the drill company and on at least one occasion made a motion for some routine matter before the board", etc. Said the court, "evidence of business transactions have been consummated during the time in question is most convincing as to mental ability." In the instant case, save for the transfers in *255 question, the evidence shows that subsequent to the execution of the power of attorney by decedent, she neither consummated, carried on nor discussed business of any kind. Decision will be entered for petitioner. Footnotes
1. As was done by Commissioner in his deflciency letter.↩